UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TGG MANAGEMENT COMPANY INC. (dba TGG ACCOUNTING),<br><br>                            Plaintiff,<br><br>  v.<br><br>JOHN PETRAGLIA, *et al.*,<br><br>                            Defendants. | Case No. 19-cv-2007-BAS-KSC<br><br>**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**[ECF No. 23]** |

      Plaintiff TGG Management Company, Inc. ("TGG") filed a complaint against eight Defendants: John Petraglia, Megan Zerba, Garrett Tapken, Erik Rhoades, Sayva Solutions, Inc., Bubbly Brands, LLC, Sash Group, Inc., and Holiday Foliage, Inc. TGG alleges, inter alia, trade secret misappropriation. Soon after filing its complaint, TGG filed a motion for preliminary injunction, requesting the Court enjoin Defendants from accessing or using TGG's trade secret information. ("PI Mot.," ECF No. 23.) TGG seeks a preliminary injunction against all of the above Defendants except for Defendant Rhoades. (*See* ECF No. 56.) The Court permitted TGG to engage in limited, expedited discovery for the purposes of its Motion. (ECF No. 48.)

      Defendants Bubbly Brands, Sash Group, Holiday Foliage, and Sayva

Solutions filed oppositions to the Motion for Preliminary Injunction. (ECF Nos. 51, 52, 53.) TGG filed a reply in support of the motion. (ECF No. 59.) Because TGG's reply contained new information that it had received in discovery (and that Defendants had not yet had a chance to respond to), the Court permitted sur-replies. Bubbly Brands, Sash Group, Holiday Foliage, and Sayva filed sur-replies. (ECF Nos. 72, 73, 77.)[1]

The Court held oral argument on the Motion on January 2, 2020. For the foregoing reasons, the Court **GRANTS IN PART** TGG's Motion. The injunction is detailed on the last page of this Order.

## I. BACKGROUND

Plaintiff TGG provides management accounting and business advisory services for business clients. (PI Mot. at 1.) TGG was founded in 2006 by its current CEO Matt Garrett. Over time, TGG alleges Mr. Garrett and others developed what they call "The TGG Way"— "a proven set of accounting and finance best practices, processes and procedures, specially designed electronic tools, and other trade secrets, coupled with financial guidance, to ensure the financial health and success of TGG's clients." ("Garrett Decl.," ECF No. 23-1, ¶ 9.) The TGG Way "uses an objective and measurable system for implementing accounting best practices, quality control, and client and team communications. It is at the center of TGG's brand, and is what differentiates TGG from its competition." (PI Mot. at 4.) The TGG Way and TGG's

---

[1] Various parties have filed objections to declarations filed by other parties, arguing that certain assertions are inadmissible. But "the rules of evidence do not apply strictly to preliminary injunction proceedings" because of "the urgency of obtaining a preliminary injunction at a point when there has been limited factual development." *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). A trial court may give "inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984); *see also Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to accept . . . hearsay for purposes of deciding whether to issue the preliminary injunction.").

Under this Ninth Circuit precedent, the Court **OVERRULES** all evidentiary objections. (ECF No. 53-5, 59-10, and 77-2).

trade secrets give TGG a competitive advantage. (*Id.*)

Defendant John Petraglia began working for TGG in January 2016. (Garrett Decl. ¶ 41.) By virtue of his role, Petraglia had access to some of TGG's confidential trade secret information. Petraglia left TGG in April 2019 and began working for Defendant Sayva Solutions, Inc. (*Id.* ¶¶ 43, 45.) Similarly, Defendant Megan Zerba began working for TGG in June 2013, had access to trade secret information while at TGG, and now also works for Sayva. Upon their departure, both Petraglia and Zerba refused to sign TGG's Reminder of Confidentiality and Nonsolicitation form. (*Id.* ¶¶ 44, 48.) On Sayva's website, Petraglia is listed as the CFO of Sayva's Accounting Services and Zerba is listed as the Controller. (*Id.* ¶ 8.) TGG alleges "Sayva provides outsourced professional services such as accounting, specialized project consulting, and full-time recruiting services." (PI Mot. at 3.) TGG alleges that as a result of Petraglia and Zerba's actions, Sayva has built an accounting division that directly competes with TGG. (*Id.*) Sayva combats this assertion, and its CEO declares that Sayva started its accounting services line of business in September 2017 (without the help of any current or former TGG employees). ("Buell Decl.," ECF No. 53-4 ¶¶ 7, 11.) Petraglia was hired in June 2019 as a Managing Director. (*Id.* ¶ 16.) Zerba, Petraglia and seven others currently form Sayva's accounting services group. (*Id.* ¶ 17.)

After Petraglia and Zerba left, TGG hired the Berkeley Research Group to conduct a forensic analysis of Petraglia's and Zerba's TGG-issued laptops. (Garrett Decl. ¶ 62.) David Jiminez of Berkeley concluded that before Petraglia left TGG, he connected a personal external USB storage device to his TGG laptop and accessed various files. ("Jiminez Decl.," ECF No. 23-24 ¶ 12.) TGG analyzed the list of files Petraglia accessed and concludes, "[t]he files . . . are sweeping and include many of TGG's most valuable assets and proprietary trade secrets." (PI Mot. at 10.) Petraglia also emailed himself various TGG materials. (*Id.*) Zerba similarly copied various TGG files onto a personal USB storage device before leaving TGG. (Jiminez Decl.

¶ 14.)

As to the other Defendants, Defendant Garrett Tapken previously worked for TGG and now works for TGG's former client, Tosdal law Firm. (Garrett Decl. ¶¶ 50–53.) Defendants Bubbly Brands, Sash Group, and Holiday Foliage are former clients of TGG. After Petraglia and Zerba left TGG, these former clients began disengagement from TGG. TGG believes the entities are working with Sayva (through Petraglia and Zerba), who is likely using TGG's trade secrets to perform accounting services for the clients. Sayva agrees only that it has provided Bubbly Brands, Sash Group, and Holiday Foliage "periodic accounting documents that reflect the actual financial state of their respective companies" but asserts that neither it or its employees have used TGG's proprietary material. (Buell Decl. ¶¶ 22, 25–32.)

Holiday Foliage periodically now works with Sayva, and it specifies that this is because when Zerba and Petraglia left TGG, Holiday Foliage did not feel its financial interests were being taken care of, so it disengaged with TGG. ("Sayva and HF Opp'n," ECF No. 53, at 6.) Holiday Foliage has received periodic accounting documents from Sayva that are identical to the financial information that TGG provided Holiday Foliage when it was TGG's client. (*Id.*) Sash Group also was a former TGG client, but it disengaged and began working with Sayva. ("Sash Opp'n," ECF No. 52, at 4.) "The only documents Sash Group has received from Sayva are typical accounting documents reflecting the financial status of Sash Group." (*Id.* at 5.) Sash Group no longer works with Sayva or any other accounting firm. (*Id.* at 4.) Finally, Bubbly Brands previously used TGG (specifically, Petraglia) for its bookkeeping and accounting services. ("Urbani Decl.," ECF No. 51-1, ¶ 11.) Bubbly Brands now receives that same service from Sayva. (*Id.* ¶ 13.)

TGG moves for a preliminary injunction on: (1) its trade secret misappropriation claim (against all Defendants); (2) its Computer Fraud and Abuse Act claim (against Petraglia, Zerba, and Sayva); (3) its Computer Data Access and

– 4 –

Fraud Act claim (against Petraglia and Zerba).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions. A preliminary injunction is an equitable remedy aimed at preserving the status quo and at preventing the occurrence of irreparable harm during the course of litigation. *See* Fed. R. Civ. P. 65. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

## III. ANALYSIS

### A. <u>Notice of the Sought Preliminary Injunction</u>

Defendants Petraglia, Zerba, and Tapken have not filed oppositions to the Motion for Preliminary Injunction. A court may issue a preliminary injunction only on notice to the adverse party. Fed. R. Civ. P. 65(a)(1). Thus, the Court must ensure the Defendants are on notice of the Motion before proceeding.

Petraglia and Zerba were served with the preliminary injunction by mail to their place of employment—Sayva Solutions. (ECF No. 23-26.) Further, counsel for Sayva and Holiday Foliage now represents Petraglia and Zerba. ("Tencer Decl.," ECF No. 77-1, ¶ 6.) Therefore, the Court concludes that Petraglia and Zerba are on notice of TGG's Motion for Preliminary Injunction.[2]

---

[2] TGG highlights the lack of opposition by Petraglia and Zerba, arguing it shows that a preliminary injunction is warranted against the two former employees. (Reply at 1.) Defendants argue that Petraglia and Zerba's lack of opposition should not be seen as an "admission of wrongdoing." ("Sayva and HF Sur-Reply," ECF No 77, at 4.) The Court does not find that a lack of opposition alone justifies an injunction, nor does the Court find it establishes guilt. The Court is only finding here that Petraglia and Zerba are on notice of the Motion for Preliminary Injunction and have failed to oppose it and present any arguments against TGG's position.

Further, Defendant Tapken appeared in this matter, (*see* ECF Nos. 41, 45) but did not file an opposition to the Motion. Because Tapken appeared in this matter, is represented by an attorney, and that attorney received electronic notice of TGG's Motion, Tapken is also on notice of the Motion. The Court now turns to the merits of the Motion.

### B. Likelihood of Success on the Merits

TGG must establish it will prevail on the merits of its claims. The Court first turns to TGG's claims under the Defend Trade Secrets Act ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA"). To state a claim for misappropriation of trade secrets under CUTSA, a plaintiff must allege: (1) the existence and ownership of a trade secret, and (2) misappropriation of the trade secret. *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012) (citation omitted). A claim for misappropriation under the DTSA has substantially similar elements. *See* 18 U.S.C. § 1836.

#### 1. Trade Secret

In establishing the existence of a trade secret, "[a] plaintiff need not 'spell out the details of the trade secret,'" *Autodesk, Inc. v. ZWCAD Software Co.*, No. 5:14-cv-1409-EJD, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015), but must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Pellerin*, 877 F. Supp. 2d at 988 (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)). Both the DTSA and CUTSA define a "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled,

or memorialized physically, electronically, graphically, photographically, or in writing if-
    (A) the owner thereof has taken reasonable measures to keep such information secret; and
    (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3); *see also* Cal. Civ. Code § 3426.1(d). TGG lists the trade secrets at issue in this case as:

(1) Quickbooks accounting file (containing TGG's accounting/financial records, income statements, and customer records/lists)

(2) Quality assurance materials (containing TGG's best practices for providing accounting to businesses)

(3) Proprietary sales and marketing materials (containing templates TGG uses to make sales proposals, as well as lists of prospective clients)

(4) Utilization report

(5) Training materials (used to train staff on how to carry out the TGG Way)

(6) financial models, templates, and statements.

(PI Mot. at 6–7.)

Sayva and Holiday Foliage argue that TGG has not established that certain information it seeks to protect constitutes trade secrets. (Sayva and HF Opp'n at 15.)[3] First, these Defendants argue that much of what TGG seeks to protect is "Microsoft Excel based" and not protectable. (*Id.*) This argument misses the point—TGG is not seeking to protect an Excel spreadsheet that anyone with Excel could create or access. Instead, TGG's CEO provides that TGG has created Excel workbooks "designed to automate the export of vast amounts of information from QuickBooks into a formatted Excel file that has been pre-programmed to run

---

[3] Bubbly Brands and Sash Group do not dispute that TGG has identified at least some trade secrets. ("BB Opp'n," ECF No. 51, at 11; Sash Opp'n at 8.)

calculations and tie out a company's financial information between different sheets" using formulas that an engineer using a programming application built for TGG. ("Garrett Reply Decl.," ECF No. 59-6, ¶¶ 5–6.) The software applications are embedded in the Excel workbooks. (*Id.*) *See Hunter Consulting, Inc. v. Beas*, No. SACV 12-1947 AG (JPRx), 2012 WL 6193381, at *3 (C.D. Cal. Dec. 10, 2012) (finding the plaintiff owned trade secrets when it claimed, inter alia, it had proprietary software programs that managed its customer information). The Court finds TGG has established that its workbooks and software templates are trade secrets.

Defendants also argue that TGG is improperly seeking to claim as trade secrets the former clients' own financial data. Again, this argument misses the mark. TGG is seeking to protect the software and codes in the Excel spreadsheets, not the data from the clients that is inputted into the spreadsheets. (*See, e.g.*, Exhibit W to Garrett Reply Decl., ECF No. 59-7 (a spreadsheet of Bubbly Brands financial statement showing that TGG's code is used on the spreadsheet).)

Next, Defendants do not contest that TGG's customer list is a trade secret. Customers lists are commonly found to be protectable when the list is based on the employer's expended time and effort in identifying specific customers. TGG claims its customer list contains the customers records, contact, payment, and sales history information. (Garrett Decl. ¶ 15.) TGG has sufficiently established that the list is a trade secret. *See MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (finding a customer database qualifies as a trade secret because the database has "potential economic value because it allows a competitor . . . to direct its sales efforts to those potential customers"); *see also Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) ("Customer information such as sales history and customer needs and preferences constitute trade secrets."); *Whyte v. Schlage*, 101 Cal. App. 4th 1443, 1456 (2002) (holding marketing research exploring "the needs

of numerous, diverse buyers" may qualify as trade secret).[4]

TGG has demonstrated that the above information has value and is not generally known or readily ascertainable through proper means. Further, TGG has established it used reasonable measures to protect its proprietary information from the public. Only certain employees have access to the information, and TGG's networks (and the employees' computers) are encrypted and require passwords for access. (Garrett Decl. ¶¶ 25–26.) As a condition of employment with TGG, employees agreed to maintain the information in strict confidence and not to disclose or use the trade secret information. (*Id.* ¶¶ 31–35.) Further, TGG states it does not provide its Excel files to clients, instead providing PDFs which do not contain the coded information. (Garrett Reply Decl. ¶ 9.)[5] These efforts are sufficient. *See Morlife*, 56 Cal. App. 4th at 1523 (finding reasonable measures where customer list was stored on a computer with restricted access and the company instructed employees to maintain confidentiality); *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990) (finding reasonable measures where customer list was distributed to employees on an "as needed basis" and employees were directed

---

[4] At oral argument, the Court expressed concerns about whether certain documents constituted trade secrets and also about the breadth of the proposed preliminary injunction. The parties then met and conferred and submitted a joint proposed order that lists the documents Defendants may not use or access. The Court therefore adopts the parties' stipulation as to what documents are proprietary.

[5] To combat this, Holiday Foliage states that TGG provided Holiday Foliage "with a copy of an Excel file in or around June 2019 that contained numerous worksheets and areas for inputting" financial information. (Sayva and HF Sur-Reply at 3.) Therefore, Defendants argue this is proof that TGG does not protect its information. (*Id.*)

But TGG has sufficiently established at this stage that it and Holiday Foliage were in a confidential relationship and that the disclosure of the Excel files was made in furtherance of that relationship. *See Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1070 (9th Cir. 2016); *see also Pachmayr Gun Works, Inc. v. Olin Mathieson Chem. Corp.*, 502 F.2d 802 (9th Cir. 1974) ("[C]ourts will consider the factual circumstances of each case on an individual basis, to determine whether a confidential relationship may reasonably be implied" such that an entity must maintain the secrecy of confidential information). Therefore, the fact that TGG once provided a client with its accounting file which contained some of TGG's trade secrets does not establish that TGG failed to use reasonable measures to protect its information.

– 9 –

to keep it confidential).

In sum, the Court finds Plaintiff has established it has protectable trade secrets.

### 2. Misappropriation

Misappropriation is defined as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> > (A) Used improper means to acquire knowledge of the trade secret; or
> > (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
> > > (i) Derived from or through a person who had utilized improper means to acquire it;
> > > (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;
> > > (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> > 
> > (C) Before a material change of his or her position knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or by mistake.

Cal. Civ. Code § 3426.1(b). Misappropriation under the DTSA is nearly identical. *See* 18 U.S.C § 1839(5).

### a. Individual Defendants.

As noted above, Zerba, Petraglia, and Tapken did not oppose the preliminary injunction. TGG alleges, and provides evidence, that Zerba and Petraglia downloaded and emailed to themselves certain trade secrets without permission. (Garrett Decl. ¶¶ 64–66, 69–71; *see generally* Jiminez Decl.) This is sufficient evidence that the two former employees acquired trade secrets by improper means. *See Henry Schein*, 191 F. Supp. 3d. at 1077 (finding a likelihood of success on the

merits of a misappropriation claim when the plaintiff alleged the defendant e-mailed and downloaded to her personal devices confidential information before leaving to work for a competitor). Zerba and Petraglia both knew that they should not have acquired these documents, as evidenced by the fact that when they left TGG, they both refused to sign TGG's Reminder of Confidentiality and Nonsolicitation form. (Garrett Decl. ¶¶ 44, 48.) Further, these Defendants were given a copy of TGG's Employee Handbook, which identifies what documents TGG claims as its trade secrets. (*Id.* ¶¶ 36–40.) Therefore, TGG has sufficiently alleged it is likely to succeed on the merits of its misappropriation claim against Zerba and Petraglia.

But TGG's motion, and even its reply brief which includes extra information following discovery, contains scarce allegations against Tapken. TGG only alleges that Petraglia has been communicating and working with Tapken and a former TGG client, the Tosdal Law Firm. (PI Mot. at 11.) This does not show that Tapken is using, or even in possession of, any confidential information. TGG has not shown it is likely to succeed on the merits of its misappropriation claim against Tapken. The Court therefore declines to issue a preliminary injunction against Tapken.

### b. Entity Defendants.

The Court now turns to the entity Defendants. Holiday Foliage, Sash Group, and Bubbly Brands are all former clients of TGG. Sayva is an accounting firm that TGG alleges to be its current competitor. The Court begins its analysis with Sayva.

**Sayva.** Sayva first argues that any preliminary injunction sought against it is moot because it is "already in compliance with TGG's requested relief that Defendants not access, copy, or use any TGG materials, return all TGG materials, and preserve the documents related to litigation." (Sayva and HF Sur-Reply at 1.) "It is possible, of course, that a defendant's conduct can moot the need for injunctive relief." *FTC v. Affordable Media*, 179 F.3d 1228, 1237 (9th Cir. 1999). But, "an action for an injunction does not become moot merely because the conduct complained of was terminated, *if there is a possibility of recurrence,* since otherwise

the defendant's [sic] would be free to return to [their] old ways." *Id.* (quoting *FTC v. Am. Standard Credit Sys, Inc.*, 874 F. Supp. 1080, 1087 (C.D. Cal. 1994)). The Court finds that even though Sayva states it is currently not accessing or using TGG's materials, there is a possibility that Sayva could start doing so. Sayva admittedly is in possession of documents that were copied, (*see* Sayva and HF Sur-Reply at 1), therefore, nothing stops it at this point from using the documents. The requested injunction is therefore not moot.

As to the issue of whether TGG has established a likelihood of success on the merits of its misappropriation claim, the Court has reviewed the documents that Sayva produced to TGG in discovery. Sayva is indeed in possession of TGG's trade secrets. TGG provides a long list of documents that Sayva produced in discovery, (Valco Decl. ¶ 7) showing that many of TGG's documents ended up on Sayva's computers—a fact Sayva does not dispute. (*See* Sayva and HF Sur-Reply at 1.) Of course, merely being in possession of trade secrets is not sufficient (assuming Sayva used no improper means to acquire those trade secrets). But, there is also evidence that Sayva is <u>using</u> certain trade secrets. For example, TGG attaches screenshots of Excel Financial Statements and Analyses for Bubbly Brands. (ECF No. 61, at 32 (sealed); ECF No. 59-3.) One screenshot is TGG's analysis for the client and the other is Sayva's. The document Sayva produced is identical to the file from TGG's systems: "Both Excel workbooks include many of the same worksheets . . . [and] both contain identically coded macros." (Valco Decl. ¶ 7.a.) But on Sayva's worksheet, it replaced the TGG logo with that of its own.[6] Ms. Valco also declares there are "at least 13 other Excel workbook files produced by Sayva that look very similar to the format of TGG's Excel workbooks and have the same macros, but

---

[6] Sayva contests TGG's comparison of the two Excel sheets, arguing that the workbooks only "look similar and contain many of the same tabs" and nothing more. (Sayva and HF Sur-Reply at 3.) The Court disagrees. The declaration by counsel and a comparison of the attached exhibits establish the probability that Sayva is using TGG's trade secrets in the Excel sheet.

– 12 –

replaced the TGG logo with the Sayva logo." (*Id.* at ¶ 7.b.) This is sufficient evidence that Sayva, at least in its accounting work for Bubbly Brands, used TGG's Excel workbooks using TGG's macro code. The Court finds that TGG has sufficiently established that Sayva is using TGG's trade secrets, which Sayva acquired when Zerba and Petraglia took the information by improper means. TGG is likely to succeed on the merits of its misappropriation claim against Sayva.

**Holiday Foliage, Sash Group, and Bubbly Brands.** Turning to the three former client Defendants, TGG produces documents showing that Sayva is using TGG's excel formats and/or codes for the clients' financial statements. For example, as noted above, TGG attaches screenshots of Sayva's Excel Financial Statements and Analyses for Bubbly Brands. (ECF No. 61, at 32 (sealed); ECF No. 59-3.) Further, TGG's attorney Ms. Valco declares that Sayva produced a TGG-branded document of financial statements for Holiday Foliage. (Valco Decl. ¶ 7.k.) She declares that Sayva is using TGG's coding for Holiday Foliage's financial statements. (*Id.*; Exhibit 3 to Valco Decl., ECF No. 61, at 35.)

Despite this, the Court finds that TGG has not sufficiently established that the former client Defendants are liable for misappropriation. At this point, the evidence shows that the former clients are too far removed from the problem. TGG has sufficiently established that Zerba and Petraglia acquired trade secrets and that Sayva is in possession of those trade secrets and is using certain documents or codes when performing accounting services for its clients. But the fact that Sayva may be using certain code or spreadsheets while performing accounting services for Bubbly Brands, Holiday Foliage, and Sash Group does not mean that the three former client Defendants are "using" the confidential information. If anything, someone else is using the documents for their benefit—inputting their financial information into the spreadsheets and sending the spreadsheets back to them. *Central Valley Gen. Hosp. v. Smith*, 162 Cal. App. 4th 501, 528–29 (2008) (holding that mere possession of a trade secret does not constitute misappropriation).

And this is logical that misappropriation does not stretch this far. Bubbly Brands sells bath bombs and essential oils, Holiday Foliage manufactures Christmas goods, and Sash Group sells handbags. It is immaterial to these companies what code or Excel spreadsheets their accounting company uses to perform their bookkeeping. The clients are not "using" TGG's trade secrets; while they may technically be in possession of some of TGG's trade secrets, it is only because Sayva is using the trade secrets in its accounting of the clients' financial information. The Court cannot say that these Defendants have acquired or are using TGG's trade secrets under the misappropriation statute. And in any event, the Court finds that a preliminary injunction enjoining Sayva, Zerba, and Petraglia from using the trade secrets sufficiently protects TGG's rights, and an injunction prohibiting the clients from also using the trade secrets (when Sayva is the one using the information) is unnecessary. An injunction should be "no broader than necessary to provide complete relief to the [moving party]." *Easyriders Freedom F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1496 (9th Cir. 1996). In sum, TGG has not established that it is likely to succeed on the merits of its misappropriation claim against Bubbly Brands, Holiday Foliage, and Sash Group. The Court declines to issue a preliminary injunction for these Defendants.

The Court finds that TGG has established it is likely to succeed on the merits of its trade secret misappropriation claim against Petraglia, Zerba, and Sayva.[7] The Court now turns to the next *Winter* factors.

### C. <u>Irreparable Harm</u>

TGG asserts that it will suffer irreparable harm if preliminary injunctive relief

---

[7] TGG also moves for an injunction on its Computer Fraud and Abuses Act claim (brought against Petraglia, Zerba, and Sayva) and its Computer Data Access and Fraud Act claim (brought against Petraglia and Zerba). The Court finds it need not analyze the merits of these causes of action. An injunction pursuant to these causes of action would be unnecessary and duplicative because the Court will enjoin Petraglia, Zerba, and Sayva from misappropriating TGG's trade secrets, as detailed below. The injunction on misappropriation is adequate to protect TGG's interests.

– 14 –

is not granted and Defendants are permitted to continue allegedly benefitting from its proprietary information.

"[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (citing *L.A. Mem'l Colliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)). However, an "intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Pac. Aerospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (quoting *Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86, 92–93 (3rd Cir. 1992)). Further, "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). And, "the loss of customers to a competitor is considered to be irreparable harm that justifies equitable relief." *Shippers, a Div. of Illinois Tool Works, Inc. v. Fontenot*, No. 13CV1349 JLS (MDD), 2013 WL 12092056, at *6 (S.D. Cal. Sept. 23, 2013) (citing *Stuhlbarg*, 240 F.3d at 841).

TGG argues it will suffer irreparable harm through the loss of customers, as clients have already switched from using TGG's services to using those of Sayva and/or Petraglia and Zerba. (PI Mot. at 22; Garrett Decl. ¶ 87.) TGG also claims it will lose the value of its trade secrets.

The Court finds that the record supports TGG's assertion that it has lost and could lose clients to Sayva and/or Petraglia and Zerba who offer competing services. The Court also finds TGG has sufficiently alleged harm in the potential loss of the value of its trade secrets. *See Henry Schein*, 191 F. Supp. 3d at 1077 (finding the plaintiff has established a likelihood of irreparable harm when it established "that it will lose established customer relationships as well as the economic value of its accumulated data on current and prospective customers"); *see also Waymo LLC v.*

*Uber Techs., Inc.*, No. C 17-939 WHA, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017) (finding irreparable harm because the former employee was in possession of confidential files and "[m]issue of that treasure trove remains an ever-present danger. . . . Such misuse cannot be unwound after the fact, nor can it be adequately compensated for with monetary damages."). Therefore, TGG could be irreparably harmed in the absence of a preliminary injunction.

### D. <u>Balance of Equities</u>

To qualify for injunctive relief, TGG must establish that "the balance of equities tips in [its] favor." *Winter*, 555 U.S. at 20. A court has the "duty . . . to balance the interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum Comm'n*, 634 F.2d at 1203. The damage to TGG, as noted above, is the loss of customers and the lost value of its trade secrets. Sayva does not point to any damage to itself if it is enjoined from using TGG's trade secrets.

The balance of equities tip in TGG's favor.

### E. <u>Public Interest</u>

"The public interest is served when [a] defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with [his] employer. Public interest is also served by enabling the protection of trade secrets." *Henry Schein*, 191 F. Supp. 3d at 1078 (citing *Bank of Am., N.A. v. Lee*, No. CV 08–5546 CAS (JWJX), 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008).) Because the preliminary injunction's reach is narrow and affects only the parties with no impact on nonparties, "the public interest [is] at most a neutral factor in the analysis rather than one that factors granting or denying the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009).

The public interest is served in ordering Defendants here to abide by trade laws and protect TGG's trade secrets.

/ / /

### F. Bond

Pursuant to Rule 65(c), when a court issues a preliminary injunction, it must also require that the movant post a bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." *See* Fed. R. Civ. P. 65(c). "The court has wide discretion in setting the amount of the bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (citation omitted). At oral argument, Defendants submitted that no bond was necessary. Therefore, TGG is not required to post a bond.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** TGG's Motion for Preliminary Injunction. (ECF No. 23.) Specifically, the Court **GRANTS** the Motion for Preliminary Injunction as it relates to misappropriation by Zerba, Petraglia, and Sayva. The Court **DENIES** the Motion for Preliminary Injunction as it relates to Tapken, Bubbly Brands, Holiday Foliage, and Sash Group.

Following oral argument, Sayva and TGG submitted separate (but similar) proposed injunctions. The Court adapted portions of both proposals and makes the following orders:

(1) Defendants John Petraglia, Megan Zerba, and Sayva Solutions (including any representatives, agents, employees, officers, directors, partners, subsidiaries, or any other persons under their control or acting in concert with them) are enjoined during the pendency of this litigation, or until the Court orders otherwise, from accessing, copying, or using any of TGG's documents or derivatives thereof, including:

    (a) TGG's QuickBooks Accounting File (including any backups);

    (b) TGG's Quality Assurance materials;

    (c) any TGG financial and accounting workbooks or workbook

templates, including the following:

(i) accounting workbooks/working papers and sub-schedules, including month-end close workbooks for corporations, month-end close workbooks for partnerships, month-end close workbooks for limited liability companies (LLCs), a process for "rolling over" templates from one accounting period to the next;

(ii) process documentation for accounts payable, accounts receivable, bank reconciliations, cash flow reporting, credit card processing, fixed assets, inventory, month-end close procedures, payroll and revenue recognition, cash drawers, cash receipts and deposits, wire transfers, and check signing authority;

(iii) documents for reporting Quality Assurance results;

(iv) working papers and schedules for financial statements, including accrued liability schedule, capital lease schedule, convertible notes schedule, deferred rent schedule, loan amortization schedule, fixed asset schedule, prepaid expense schedule, AP tracker template, credit card receipt tracker template, insurance schedule, employee tracker template, intangible asset schedule, IRS Form 941 quarterly reconciliation template, weekly client update template, breakeven analysis template, capitalization table template, tax return (schedule L) to balance sheet reconciliation template, triple bottom line template, covenant compliance template, key advisors list template, cash forecasting template, templates specific to and inventory-based business, and month-end checklists; and

(v) any other financial statements or financial models prepared by TGG;

|     |     |                                                                                     |
| --- | --- | ----------------------------------------------------------------------------------- |
| (d) | TGG's sales and marketing materials;                                                |
| (e) | TGG customer lists and information;                                                 |
| (f) | TGG's Utilization Report;                                                           |
| (g) | TGG's internal training and instruction materials, including for how to use the templates, workbooks, and schedules described above in Paragraph (1)(c); |
| (h) | any other materials copied or downloaded from TGG's computer systems by Petraglia and Zerba to any external drives, personal email accounts, or cloud storage accounts; and |
| (i) | any files derived from the above categories (e.g., SAYVA-0002300; SAYVA-0002284; SAYVA-0002391; SAYVA-0002290; SAYVA-0002301; SAYVA-0002353; SAYVA-0002355; SAYVA-0002367; SAYVA-0002368; SAYVA-0002381; SAYVA-0002399; SAYVA-0002373; SAYVA-0002388). |

(2) Defendants Petraglia, Zerba, and Sayva are enjoined from using any of the forgoing documents to solicit business from any current TGG clients whose information is contained in the materials described in Paragraph (1).

(3) Defendants Petraglia, Zerba, and Sayva will return to TGG any external drives or USB storage devices that contain TGG documents.

**IT IS SO ORDERED.**

DATED: January 14, 2020

Hon. Cynthia Bashant
United States District Judge